Good morning, Your Honors. Ben Coleman for Mr. Totten. I'd like to focus in on the one general claim that we made. It has three sub parts. I want to first focus in on the Weatherspoon violation that there were improper comments by the prosecutor regarding Mr. Totten's credibility. Frankly, based on Weatherspoon it's our position that there was clearly a violation. There was repeated I think statements that were also couched in terms of calling Mr. Totten clay, calling I think his truth telling ability is like clay, and even saying I think you know the lies that he told, you meaning the jury. Based on Weatherspoon, that's improper argument. Judge Trott dissented in Weatherspoon. He didn't necessarily think that I think arguments are improper, but the law of the statute says that such arguments are improper. That alone constitutes error. And what I'd like to do is discuss harmless error because the government strenuously argues that any error that may have occurred was harmless. Before getting to how strong the government's case was, I'd just like to run through a few factors. Number one is the jury deliberated in this case for three days. And this Court has held on repeated occasions that length of jury deliberations is a factor to consider in the harmless error analysis. Number two, this was improper comments about the defendant's credibility and testimony, which is the heart of any defense case. So we're talking about the heart of the matter here. These are comments that go to the heart of the matter. That's another factor that weighs against harmless error. In addition, these comments occurred during rebuttal closing argument, the very last thing in the case. The defense did not have an opportunity to respond. Again, another indication of harmfulness, not harmless error. And of course, the objections were overruled, no curative instructions were given, and the prosecutor continued with the improper comments even after the objections. The prosecutor could have stepped back and moved on to different types of comments, but chose not to and proceeded with these comments. Given all those factors, I think those are all strong indications of harmfulness as opposed to harmlessness. Finally, I'd like to talk about the strength of the government's case, which they rely on heavily in saying that this was harmless error. This was not an overwhelming government case, as they put it. This was not a case where a defendant engages in a hand-to-hand sale with an undercover officer and confesses. It's not even a case like Weatherspoon where this Court found under plain error review that reversal was required, where a convicted felon without standing warrants was sitting on top of a gun and this Court reversed a felon in possession of a firearm. This was a case that centered around intent to defraud. Did Mr. Totten have the requisite intent to defraud? His defense was that to the extent that any misrepresentations were made, that he made any, he was basing his representations on what the head of the company, this guy named Joseph Crawford, what he told him. And in fact, introduced into the record was a statement that Crawford made to the agents in which he informed the agents that he had made misrepresentations to Mr. Totten. He had made misrepresentations to Mr. Totten about how much the the how many of the individuals were actually going forward and purchasing the golf clubs. He made misrepresentations to Mr. Totten about the professional golf players that played with the golf clubs. He made misrepresentations to Mr. Totten about refunds, that he was taking care of all the refunds, which was the main problem in this case. The owner, Crawford, was not taking care of the refunds. Mr. Totten would say, would forward the complaints over to Crawford, and Crawford would just ignore him. And in the record, introduced into the record was evidence that Crawford made his misrepresentations to Totten. So when you look at all this and when you're talking about intent to defraud, when a defendant gets up on the witness stand and says, look, I didn't have the intent to defraud, I was trying to do my best, and actually calls in, in the view. The jury didn't exactly believe him. Obviously, the jury didn't believe him. But I'd encourage the Court, and I know that this is an argument, but if the Court looks at the defense's, Mr. Totten's trial counsel's closing argument, it sets forth a persuasive case. And he, and obviously the jury didn't believe him, but the problem here is that perhaps the jury's, perhaps the juror's decision was based on the improper comments on his credibility. But perhaps it was built on the fact that he testified. Right. He testified, and so they had to judge whether or not they were going to believe him or not, and when the prosecutor is making the improper comments about his credibility, that, that is the heart of the matter. You know, of course, I'm not going to argue Witherspoon with you, because I'm perfectly happy to assume that the comments were improper. But these comments did not imply any kind of extra court knowledge. I mean, they didn't have any vouching connotation. They were totally founded in the evidence. And maybe the prosecutor used some language that he shouldn't have used in describing the defendant, but then I'm not so sure that you've got to have kid gloves on. The guy took the stand. He made his credibility an issue, not the prosecutor, by taking the stand. And he told things that weren't – he said things that weren't true. Well, I guess there are two things. The first is that in Witherspoon, the Court made it clear that these comments are not only improper because they – if they imply outside, out-of-the-record knowledge, they're – there are two reasons why these comments are improper. And the second one is that it puts the imprimatur of the government behind the comment. And that was – Well, what else is the prosecutor going to say? The guy took the stand and lied, except to say he took the stand and lied. Now, maybe he doesn't have to go ahead and, in effect, call him a snake. But he's certainly entitled to say the guy took the stand, he said A, A is not true. Therefore, he lied, isn't he? Well, he's not allowed to say, I think – I think that he told lies to you. I think that – Okay. So he's just going to stand up and say he lied. And nobody's going to think that's what he thinks. Well, I think right now we're getting into the – Judge Trott and Witherspoon dissented on that ground, but the majority rejected that approach. And the majority based their decision on – But the harmfulness of it – my point, as I said to begin with, I'm not arguing Witherspoon with you. I'm prepared to accept that the comments were improper. But the extent of the impropriety, you can consider in weighing harmfulness. And that's why we've also – we have claims that, you know, on the beginning of the cross-examination, the prosecutor engaged in that sort of TV gimmicky, are you aware you're under oath? What's wrong with that? I mean, there's – there was no need to ask him. There was no suggestion that he didn't understand he was under oath. No other witness in the case was asked that he was under oath. And then we also – I still say, what's wrong with it? Well, there are – there are – I at least cited one case that says it is improper to needlessly remind a witness that they're under oath. It makes an improper suggestion that the prosecutor believes that the witness is lying when there's no reason – there's nothing to indicate that he had a language barrier or didn't understand that he had his oath. So there is case law to suggest that it's improper. In addition, we've also obviously raised other instances where we believe the prosecutor overstepped the line in his rebuttal also. So, yes, I mean, you know, you look at the – you look at what occurred in the improper comments, and, you know, to the extent that you're weighing harmfulness, you need to – you need to look at the extent of it. But this is not our only claim of misconduct. It's just the one, given the limited time, that I'm focused on. So we think that there was an extensive, not just one, but extensive misconduct in the rebuttal closing argument, and that the Court should consider all that. And I do need to leave some time for my co-counsel here. Good morning, Your Honors. The jury cites for Co-Appellant Winters, who is arguing brutal error and erroneous denial of the severance motion. Mr. Winters is relying, in addition to his own exercise of record, very heavily on the exercise of record of Mr. Totten. Particularly the transcript of the rebuttal closing argument, because it's our position that in that rebuttal, the prosecutor tells the jury, in effect, that they can use the – first of all, he says that it's very damaging, very important evidence, the statement made by Mr. Walker, through the testimony of the FBI agent. And he tells the jury that this is evidence that shows that all three co-defendants, all three of them. Well, in context, you know, it doesn't say that. He's gone through the evidence that shows that Totten knew about the fraud, that Winters did, and that Walker did, and then he says, and these guys. No. No. I've read it. That's what happened. It's right here. I'll read it to you. I have read it. We don't need to reread it to me. I've read it. And in the – right before that, immediately before it, he's gone through the evidence of each of the three. So in context, it's not a statement that – that he should attribute Walker's statements to everybody. With all due respect, you're wrong, and I'll explain to you why you're wrong. That's why I asked the question. We look at what a reasonable juror will interpret from these remarks, and a reasonable juror can rationally take this to mean when he says, this is very strong evidence, Marvin Walker's admission. The only people who didn't know that the purpose of the call was people receiving the calls, these guys knew it. They knew it was false. A reasonable juror can interpret that as referring to the Marvin Walker admission, and therefore, a reasonable juror can break the law by using inadmissible hearsay statements to convict Mr. Winters and Mr. Taunton. That's why we have Bruton error. That's why the district court was wrong in the United Services motion. I don't even understand how you got Bruton error. I mean, he didn't – Walker just said stuff that Walker did. That's a party admission. He never, ever implicated anybody else, made no statement about anybody else, had nothing to do with anybody else except Walker. So where's the Bruton error? Walker's statement incriminated Walker. Yes. Okay. And it established the truth of paragraph 15 of the indictment. Here, in the rebuttal closing argument, and again, I'm telling you, and you want to look at the way that the jury, a reasonable jury, could have translated it, and a reasonable jury could have taken this as telling them that this statement, which, yes, on its face, only goes against Walker, can be used against all things. And for God's sake, just a couple of pages later in the transcript, the prosecutor tells the jury that Rick – this is page 37 of the Taunton ER, lines 2 to 7. The prosecutor tells the jury that Rick Winters is an aider and abetter and a knowing co-schemer. The clear implication is that Winters is therefore liable for the crimes and the admissions of Walker. I mean, on the very next page, what we're talking about, the statement was on Taunton ER 20. On the very next page, ER 21, lines 4 to 11, the prosecutor tells the jury that the people receiving the phone calls would not have participated if they had known that the real goal of the phone calls was to sell them golf clubs, not product evaluation. Therefore, Mr. Walker's admission that he was selling golf clubs, not arranging for product evaluation, goes to establish intent to defraud. And it goes to establish – it can go to establish intent to defraud against all three codependents, because a reasonable juror, in hearing that, in that – the court reporter took it down in the paragraph. She heard it in that way. It's certainly reasonable that the jurors would have heard it in the same way that the court reporter heard it, which is a paragraph in which the prosecutor said – probably handled a thousand jury trials. And I don't think jurors think in sentences or paragraphs. I think they just sit there and listen to an argument. I don't think judges think in sentences or paragraphs. In fact, most people don't even speak in sentences or paragraphs. They're just up there talking. The law says that we – you know this as well as I do – that we have to look at what a reasonable juror can find based on this. And in this case, it is really indisputable that a reasonable juror could have heard this as telling them that it is all right for them, it is permissible for them, to use inadmissible hearsay statements against Mr. Winters and Mr. Totten. That's why this conviction has to be reversed. I respectfully reserve a couple of minutes for rebuttal, if I'm lucky. Good morning, Your Honors. Philip Bronson for Mr. Walker. Our argument is essentially that there was insufficient evidence to sustain the conviction because there is a lack of substantial evidence that he – that Defendant Walker knew of the fraudulent scheme. The prosecution essentially relies on several factors in claiming that there was substantial evidence, that the jury heard Walker repeatedly mislead potential test players about the nature of the program, the refund and return conditions, and the credit card charges, and that these misrepresentations establish a reasonable inference that he knew about the scheme. But on the other hand, there are quite a number of factors that weigh against this conclusion that this might be a reasonable inference. Though he was paid – though Walker was paid a higher commission, he was still paid on the basis of sales rather than being a – than having any share of the profits. There was little evidence that he was an insider or confidential or confident of Mr. Walker. Isn't just the fact that he was being compensated based on sales itself indicative? Because that's not what he was telling the people he talked to. He wasn't telling them. He was telling them golf clubs. Isn't there a disparity right there? Yes, there is. But the argument is that – Well, it's different to the people that he's sending these things to than he conceives of himself. If he thinks of being compensated for sales and he's telling people we're not selling you something, we're sending you test clubs, isn't the inference possible right then that he knew he was deceiving the people, that he had the intent to defraud? The inference from that is that he was trying to increase his sales. Well, he calls them a sale for himself, but that's not what he tells the people he's sending the golf clubs to. Well, that's true, but in light of the fact that there's little evidence that he was an insider or a founder or organizer – He doesn't have to be an insider to know that he's telling people something that he thinks is different from something he thinks is the case. Well, he solicited his own deals on his own part. He worked independently of Mr. Crawford. He told people that we're not selling you golf clubs. We're sending you them for test purposes. And he was thinking of himself as receiving compensation for sales. Those two aren't the same thing. He doesn't have to be an insider to know those two aren't the same thing. And it seems to me ample for the jury to infer from that he knew he wasn't telling them the truth. What else is there? That's in the absence of it. And the evidence of him being an insider – You don't need direct evidence and you surely don't need to be an insider to be the frauder. If he knew what he was doing was not truthful in telling them that we're not selling you golf clubs, he's guilty of fraud. The fact that somebody else may be collecting some of the profit because they've got a grand scheme doing this to lots of people as the insider doesn't mean that he wasn't doing it or that he didn't know he was doing it. But he didn't work at the headquarters of this organization. No, no. If he's telling people I'm not selling you golf clubs and he knows he's What more is necessary? What's all the insider bit? He's not being convicted of being an insider. He's being convicted of fraud. And telling people that I'm not selling you something when he was selling them something sounds to me like fraud. But I thought the cases say that in order to be convicted of wire fraud, that there has to be evidence when there's a scheme, there has to be evidence that he knew about the scheme. He was doing it over and over and over again. Isn't that a scheme? He was supervising other people. Your Honor, then I would submit, I would like to reserve whatever time is left for Rubeau. Okay. Please. Morning. Ken Julian on behalf of the United States. I would like to take it on Weatherspoon, but before I do, I want to make one small point on the length of the deliberations in this case. And I would invite the Court's attention to Totten excerpts of record 131 to 132 and government excerpts of record 519 to 628. And there you'll see that the jury only deliberated on three days. And on the first day the jury deliberated, there's over 100 pages of transcript. So the jury didn't even get the case on the first of the three days until late in the afternoon. Then there's a full day of deliberation, and then they come back. So in reality, we're talking about two here, maybe two days and some change in deliberations. And that's really not a long time in a complex fraud case with three defendants and hundreds of exhibits. The cases that the defendant cites about three-day deliberations or four-day deliberations involve one-transaction drug cases. Now, on to the Weatherspoon and whether argument was improper. And, Your Honor, I'd like to address that briefly. What I think the government's contending is that this argument was not improper in a legal sense. Certainly it was inartful, and counsel should attempt to refrain from using the first person in any part of closing argument. Rebuttal happens to be the most unscripted part of the case. You're responding to arguments that have just been made by defense counsel. I think it's easy to slip into, although we always try to, or at least most of us, try to guard against that. The danger in Witherspoon is this. That's when, in the cases that the defendant cites, they all rely on this core legal principle where the government vouches for a government witness, or the government implies some knowledge of facts outside the record that the jury should, you know, rely on the prosecutor's opinion, take my word for it, this guy's guilty. And in that sense, these statements were not improper. Counsel really focuses on the words, I think, as some kind of magic word that makes it per se improper. Here, what the prosecutor was saying, and I was the prosecutor in this instance, was when I think of. Clearly a proper analogy in a case, Clay making a proper analogy that this gentleman has changed his story from what he told the agents in two prior interviews where he very clearly had knowledge of the fraudulent scheme. He said that to the agents. You know, this was like a, he didn't say this, but it was a Ponzi scheme in the sense that they were taking money from new test players to refund old test players. He knew about the gotcha terms. He knew about the fact that refunds, you know, weren't being given. He said all these things to the agents.  So I think improper, you know, yes, it was improper in the sense that one should stay away from first-person arguments, but I don't think it was legally improper because it didn't cross that line. And I would invite. Yes, sir. Kennedy. It's a line question, and maybe it's when you get on the thin enough ice that you go through it. I think that's right, Your Honor. I really do. And I like the comparison to Witherspoon because in that case, that's a felon in possession case, it's a liar's match, and basically you have four witnesses that matter. And the government prosecutor in that case is basically saying that these guys had cops, the cops. But I don't believe it's truthful. I don't believe it's more than that. I mean, over and over. They have no reason to lie. They're going to get fired. They're going to be convicted of perjury. They lied to you. They lied to the judge. These witnesses are telling you the truth. I don't believe these portions of the two lay witnesses in that case, all of that implies some knowledge that that prosecutor had, that he was trying to get the jury to use. This didn't happen in this case. In this case he was trying to get the jury to use. I understand the distinction, Your Honor. I think it has a lot to say about the question that Judge Reimer was asking in terms of the impact. I mean, the difficulty with Witherspoon, and I don't want to debate Witherspoon either. The difficulty, it makes very clear that it's not simply I have extra knowledge on the side so you can believe me. It's the notion of standing up and saying I'm here for the United States and, you know, I'm from the government and you should trust me. And as long as that element's there, it's really difficult, I think, to apply Witherspoon to say, well, some's okay and some's not. Because just the fact that you stand up and say you're for the United States runs the risk of somebody inferring that you've got the stamp of approval from the U.S. government. But you can take everything you just said and lead it to the second part, and not that we're characterizing this misconduct, but it really asks a serious question. Is this something that's going to have the improper influence in the jury that you're concerned about? I think that's exactly right, Your Honor. And I believe it really, to be correct about the statements, is when I think of statement is a lot more innocuous than I think I believe. So I believe that point is made. And I'll move on to another part of this. And that is the, you know, asking the witness up front if he understands the oath. There again, there can be a danger point here where a prosecutor gets a, is in the middle of cross-examination, gets an answer that he or she doesn't like, and then goes about saying, do you know you're under oath, blah, blah, blah. Well, that's sending a signal to the jury, hey, I don't believe this answer. That's a danger. That danger did not occur here. It was a question at the beginning of cross-examination after a lengthy direct examination that was given. It was totally a fair question, and it set up the evidence to come for the jury to And the witness in this case said that he understood that his obligation was to tell the whole truth and not be misleading, but another witness may have said something different. Ken Lay, I think, said, I'm, you know, here to answer your questions or something to that effect. And so I think that that's helpful information for a jury who's being called upon to see, to make a determination on whether a witness is lying. The Passions argument, same thing. The danger, I think, there is where a prosecutor brings up something that's irrelevant to the case, such as in Witherspoon, about the impact on the community. Here, the abuse that was being suffered by people was relevant evidence, because the company and the people involved would use that to get people to give up seeking their refunds. And I think, you know, common sense will tell you that that will have a greater impact on older people. And I believe that argument came in direct response to one of the defendants saying, hey, wait a minute, the people who got their money back from the credit card companies, which would include some of these older than 55 people, hey, they weren't really victims because they got their money back. And I think it's a fair point to say, no, wait a minute. Now, this abuse of being lied to and, you know, the feelings that go along with that, that does make you a victim, even if, you know, six months or a year later, you get your money back from another source. On to address Mr. Sy's point, and actually, let me make another argument real quick before I do that on why this is harmless error. And this goes for all three defendants. And, in fact, I can speak now, maybe I'll try and kill three birds with one stone here, and talk about why the evidence was overwhelming in this case against all three defendants. In being particular about what was it that was overwhelming in this case, and what was overwhelming in terms of the evidence was that each of these three defendants made misrepresentations personally to test players. And there are many of them, but three that come to mind are that their credit card would not be charged. Secondly, the nature of the program, whether it was actually a good faith product evaluation or a sale, and finally, the terms of the program, that there was some risk involved. In, you know, in each of the defendants' cases, the government brought in victims who testified directly for each one of them. This person lied to me about the credit card charge, or the terms of the program, or the nature of the program. We had tapes that were played. Each of the defendants' voice on tape in which the jury heard for themselves these defendants making those misrepresentations. We had coworkers, at least one coworker, for each defendant, which said, I heard them making misrepresentations, they directed me to make misrepresentations. And then in Mr. Totten's case, his testimony at trial, and I do want to invite the Court's attention to a particular part of the record, because I neglected to put this in the fact statement, although it's discussed later in the brief, and that is government's excerpt of record 358, and then at 633. And what you have there is a statement by Mr. Totten from the witness stand where he talks about knowing that these things are sales, that that's what's going on. At 633, we have a script. It's labeled Script No. 1. It's produced in the middle of the trial for the first time, despite being asked for reciprocal discovery, on redirect examination. And he says, yeah, this is the script that I wrote up and had my people use. And lo and behold, the last line on page 633, it tells the telemarketer, tell the person that we're not we're specifically not trying to sell you anything. We just want an honest evaluation. Just couldn't be more clear, a lie. And those are two things that Mr. Totten said from the witness stand, regardless of the conflicting testimony regarding his statements of good faith versus what he said in the interview. Same thing with Marvin Walker. And I believe, I forget which of the Justices brought that up this morning, but Judge Justice Clifton really hit the nail on the head. And that is that, and especially with respect to intent to defraud, the law is when a witness or, I'm sorry, when a defendant makes knowingly false statements in furtherance of the scheme, that is evidence of intent to defraud. And in this case, we had all those misrepresentations by Mr. Walker and, you know, all those layers of proof that I discussed previously. Finally, I believe Justice Reimer brought this up and got this right. There's no – there was simply no Bruton issue here. Mr. Winters was not the subject of Mr. Walker's statements, number one. Number two, the structure of the argument, it was a – you know, you have three people who did the same thing. It was just a convenient way of – of structuring it. The thing in this case is they all knew that the – that the product evaluation statements were false, and the prosecutor then discusses how each of them knew. Totten knew because of these reasons. Winters knew because of these reasons. And Walker knew because of his admissions. The only people who didn't know were the people receiving the call. You know, they knew it at the end. I really beg to differ. I – I can't understand how a reasonable juror could even – could think that the prosecutor was asking them to use Walker's evidence against Winters. They were all discussed individually, and that – that request was never made by the prosecutor to the jury in this case. Unless the Court has further questions, I'll sit down. Kagan. I don't think so. Thank you. Okay. Mr. C. Just a quick point on prejudice, overwhelming evidence, not true. First of all, the government introduced only nine prosecution witnesses who presented evidence against or even mentioned Mr. Winters. The defense presented 21 witnesses. It doesn't sound like an overwhelming prosecution case to me. Second, the jury began their deliberations on Friday, November 7th. They reached a verdict on Thursday, November 13th. They clearly deliberated for more than five hours. They deliberated for several days. People v. Woodard, 23, Cal, 3, 329, and 341, the California Supreme Court found that when deliberations go on for more than five hours, the issue of guilt is far from open and shut. So this was not an open and shut case. In terms of the statement and in terms of what apparently he just stated about his rebuttal closing argument, in Gray v. Maryland, 523 U.S. 185 of 189 to 193, the U.S. Supreme Court made it clear that a redacted confession must not reference the co-defendant by implication and must not lead the jury to conclude that the statement refers to the co-defendant before them. Now, when the prosecutor said that this statement by Marvin Walker is very strong evidence, the only people who didn't know the purpose of the call were the people receiving the calls. These guys knew it. They knew it was false. That statement they, these three guys, does exactly what the United States Supreme Court in Gray v. Maryland said you cannot do. That's why it's brutal. Thank you. I just want to go over some of these facts that the government mentioned as to why the case is overwhelming. First, on the issue of sale versus test play, I believe the evidence was clear that Mr. Totten had the people in his office and he himself called what was being given on the credit card, a security deposit, which is what it was. He wasn't telling them that your card wasn't going to be charged. He had his people telling him it was a security deposit. There was also evidence to show that he would speak with and his people would speak with or he was instructing them to speak when they were speaking with the potential players. Was there any evidence in the trial that any of these individuals got their security deposit back? Yes. Several did get them back. A lot did not get them back. Don't get me wrong. I mean, there was a fraud here. There's no doubt about it. But what the government is doing is they try to lump everything into one and say this whole thing was a fraud and therefore, you know, we proved it and Mr. Totten is guilty. But you have to look at each particular individual and what they did and what they knew. Mr. Totten was trying to make it clear to the people in his office, you have to call it a security deposit. Don't tell them they're not going to be charged. The government claims that they called the witness who said that Mr. Totten lied to him when he spoke to him on the phone. Well, it turns out that that phone conversation was recorded and the supposed lies that Mr. Totten supposedly told were not on the recording. So, I mean, the evidence was not overwhelming. You have to look at each particular individual. Thank you. All right. Thank you. Anything further? No. The Court is acquitted.  Thank you. The matter just argued will be submitted and the Court will stand in recess for the day.
judges: Gibson, Rymer, Clifton